United States v. Bontemps, case number 19-10195, and this case is also set for 10 minutes per side, and counsel, when you're ready, you may proceed. May it please the court and Laquan Clark of the Federal Defender's Office on behalf of Tamaran Bontemps. This is a pretty narrow question. We don't disagree with the parties about what the patrolling law is. We disagree vehemently about that. One of the reasons I gave the Glover case as a 28-J letter the other day was it focuses us on whether there is a reasonable inference to be drawn. Well, can I just ask a question that might crystallize this? Is your position that a bulge is definitively, standing alone, never enough for probable cause? A gun bulge? That's the question. It's a bulge. It's not a gun bulge. Officers construe, they take the inference, and that's the key question, so I'm glad you asked the question, to phrase it that way. Officers say a heavy bulge or a bulge, whether it's up here, or if it's down in the pocket. Could you get a bit closer to the microphone? The officers' inference is that there is a bulge in clothing. It's that their training, their experience, is that it correlates to a gun. We know from the stop-and-frisk cases and studies that I pointed out in the briefing, and it's unrebutted by the government, that in reality, when the government relies on just a bulge in clothing of any kind... Those studies don't seem to address the question of, when you see a bulge, how often do you turn out to be wrong about what the bulge is? I disagree with that, and I don't have my briefs behind me. Is it out of some tab on Ohio's back, isn't it the Ohio State Law Journal article? It talks about Philadelphia, where there were roughly 200 bulge-only stops, and they only found a firearm in one of them. Right, and it came out to less than one-half of one percent. Which state's law journal was that in? I believe it was Ohio. Okay, that's enough. But let me just ask, going back to... So, they turn onto Robles Way, and I know there's a disagreement between Beretto and Taun. Beretto says that they originally come up behind him, he loops around, comes back opposite them, then turns back around behind them. How many lanes of traffic are there going each way in this location? I believe there's one in each direction. They're fairly wide, it's near a shopping center and business district. Okay, so as Bonnet-Temps is walking, he's in the front two pedestrians, right? Right. Is he closer to the road, or is he away from the road? I believe he's on the bush away from the roadside, but the exhibits were submitted, and that would double-check. I believe so. Okay, so Taun would have had to look past Beretto through the window of the police officer's car and see Bonnet-Temps with some kind of bulge in a hoodie, right? Correct. And was there any testimony that a gun was bobbing in and out? No. And it was actually a shoulder holster, right? Yes. And that wasn't true with regard to the other observed person, because he had one kind of in the middle area of his sweatshirt? Mr. Mills had a gun in the pouch pocket of his hoodie, yes. Is that kind of the hand area? Yes, one right here. He also had his hand there. Okay, so how many feet was it between Taun's viewing position and Bonnet-Temps? I don't think that's in the record. I don't know off the top of my head what a typical width of street is. I will say that the district court judge credited not Beretto for seeing a gun, or a bulge I should say, for seeing the bulge on Bonnet-Temps before the stop. He did credit Detective Taun for seeing the bulge. Yeah, well Bonnet-Temps said he didn't see the gun on your client before the stop, right? Detective Beretto? Yes. Taun was the only one who saw the bulge, right? Before the stop. Before the stop. Yes. And then Beretto saw the bulge after the stop. Our position is that's too late, and that was the judge's position as well, that what happened afterwards is too late to provide a reasonable inference of suspicion. To provide reasonable suspicion to justify the stop. Okay, is there any Ninth Circuit cases where there's been a bulge enough, it's been enough for a stop? No. The government cites the flatter for that position, but as I point out in the brief, the cases it cites all involved a bulge plus something else. And that's why I think this case is really important. Because if you hold that the government is correct, is lawful, then I'm walking down the street with an oxygen tank because I have COPD in another 20 years in the valley. I have it under my feet. And I'm otherwise minding my own business. They constrict the third, the first, none of them. But can I get, this may bring us back to Judge Nelson's original question. I just want to make sure I understand what you're arguing. Because on the one hand, you could be arguing that a gun-shaped bulge without more can never generate reasonable suspicion. Or you could be arguing that in this case, the officers didn't have a basis to conclude there was a gun-shaped bulge from the vantage point that they had prior to the stop. So which one of those positions are you pressing here? Or are you pressing both? I'm pressing both. I think we've got to get somebody else on mute. Is that David Spencer needs to mute? Let me try again. Go ahead. I think if you review the video that the government submitted, you look at the still picture. When the government testifies that it's a gun-shaped bulge, they're applying their own assumptions about what the object is by carrying it, characterizing it as gun-shaped. There is nothing in the protrusion underneath the sweatshirt for Mr. Bontowns, nor in the dragging down shape. It's just a heavy, you know, you can say that it has a straight edge on the bottom shape for Mr. Mills. But neither of those things are uniquely gun-shaped. Was there any evidence he had his arms in the same position as shown on the exhibit that was admitted at the suppression? In other words, did his arm position highlight whatever he had, highlight the weapon against his chest? There is no evidence, and I believe even the government, during the discussion before the testimony was taken, the government conceded that Mr. Bontowns, whatever was under his hoodie, that it was completely covered by the hoodie. And I think the evidence, both from the video and from the testimony, was that there was no more detailed viewing of whatever that was until after the stop and Mr. Bontowns sat down. And at that point, the angle of view came down and you could see, and there was a kind of a greater opening, you could see a black object. I would concede that if they had seen that much information while Mr. Bontowns was walking down the street, there would be a reasonable inference to draw that it was a gun. Because it's more consistent with what a gun is and it's more information. But just having something sticking out, not defined in any way, it could be any number of things. Although the officer here, Detective Tong, said that it was obvious. He said that a couple times in his testimony and the district court credited that. And so the issue, I guess, is you seem to be asking us to overturn the district court's determination after he heard that testimony. I'm not asking you to overturn the district court's determination as far as believing Tong's testimony that he saw an obstruction. If you look at the video and you look at the still from the video, I think you can, and it's a de novo review, and I would remind you that the government had the burden to prove that they have reasonable evidence. Not me. Not the defendant. So I don't think that there is sufficient evidence that this obstruction, this bulge of some sort, is definitively anywhere near a reasonable basis for saying it's a gun in light of the studies that have been done, that it is quite likely it wasn't a gun. Yes, it was, and it often is with the cases. I know my time is up. I just want to finish the sentence. Frequently the cases we see are guns. That's the nature of selecting the cases out to be criminal cases. Okay. Do you want to reserve? We'll give you a minute on rebuttal at least. Good morning, Your Honor. May it please the court. My name is David Spencer. I represent the United States. I'd like to begin with the question that Judge Nelson asked at the outset. Was this a bulge or was this a gun bulge? Your Honor, this was a gun bulge case. As Judge Brass noted, Detective Tan testified that he saw the bulge in Von Temp's sweatshirt, and he believed it to be a firearm, and the district court specifically credited that testimony in finding reasonable suspicion. In addition, the district court himself reviewed the body camera footage, which is before this court in the record, and the district court concluded that the bulge in Von Temp's sweatshirt obviously and clearly appeared to the district court to be a gun. That's it. Let me ask you about the videos. Those were all taken after the officers left the vehicle, right, and after the defendants had stopped. Correct, Your Honor. And the actual viewing, Tan's viewing was from across the road, right? Correct, Your Honor. And he was in the passenger seat, wasn't he? He was, Your Honor. And so his, what kind of a vehicle was it? Leave it like that. Some kind of SUV? Correct, Your Honor. Please ask even more. What type of SUV? I don't know beyond that. I mean, how high off the ground was he? From the body camera footage, it looked like a normal midsize SUV. Well, the body camera footage is after he's already left the police vehicle. Isn't the key point when he's in the vehicle, looking across the street, and he says that he got justification for stopping Von Temp's from what he saw from across the street looking through the front of the windshield? That's correct, Your Honor. That is the key point, what Detective Tan said. He testified that he saw Von Temp's in his sweatshirt very clearly, and he testified that Detective Beretta, who was driving, had slowed the vehicle down to only 5 or 7 miles per hour at the time he looked across and saw it. He had a clear view. Do you agree that Von Temp's was away from the roadside, walking side by side with the co-defendant Mills? They were on the sidewalk. I'm not sure what Your Honor means by away from the roadside. Well, they were walking side by side, right? I believe the testifier… Mills and Von Temp's were in the front, weren't they? They were walking in two groups of twos. Okay, and so the police officer, who was on the street side? Mills or Von Temp's? I'm not sure, Your Honor. Well, if counsel for the appellant said that she believed the record was that Mills was on the street side, Von Temp's was beside him, away from the street, and they were walking side by side. Your Honor, I don't recall from the testimony if it was clear who was on the street side, but I do recall that Detective Kahn testified that he could clearly see Von Temp's front in the bulge. So, in terms of, is that enough then for a reasonable suspicion? If any police officer says, I could clearly see across a two or four lane road, and I could clearly see a bulge that looked to me like a firearm. Yes, Your Honor, where the district court credits the testimony, and here the district court did credit the testimony, the place where Detective Kahn testified, he could see them very clearly, is at excerpts of Record 48. And I do think it's significant, Your Honor, that the district court reaches the same conclusion when he sees essentially what Detective Kahn saw on Von Temp's sweater. And it's excerpts of Record 39 and 82. But did he see, did the district court ever see what the officers saw from the car, or only after they got out of the car? Only after they got out of the car, Your Honor. So it is a little bit later temporally and from a different vantage point. I mean, let me just put a finer point on this. And the thing that concerns me, I mean, on the one hand, yeah, I want to credit the officers. The district court heard everything. On the other hand, I'm sensitive to the inquiry that Judge Gwinn is making, which is, boy, this seems a little bit of a stretch here. And one conclusion one could reach from this is they saw four African-Americans walking along the street and decided they look suspicious. Let's just stop them. And that's the trouble that I have with this case is this is different than a lot of cases where even if the officers had been walking down the street and seen it, I mean, you know, what really prompted them to stop? And the concern I have with the government's position here is how do we limit that in a way? And maybe the limiting factor is this is what we do. We defer to the district court who hears the evidence and is convinced that the officers are telling the truth and that they really did have reasonable suspicion before they stopped them. Is that the position here? Is that what we're supposed to do? Your Honor, I think two responses. As a legal matter, I think, yes, under the Clear Air Standard Review, I think this court should defer to the district court's findings. In terms of the court's broader concern that you articulated, I think there were multiple reasons for this stop, Your Honor, that are borne out in the record. They pull up alongside them, or they're driving alongside them, and Detective Beretto thinks he sees a firearm in Mill's sweatshirt, not the defendant's. Hold on, back up, back up. He didn't ever see the firearm in the sweatshirt. He saw a bulge that he now claims looked like a firearm. He saw a bulge that was hanging down in the front pocket, and he testified he believed it to be a firearm based on its weight and characteristics. You're correct, Your Honor. You seem to rely upon the Flatter case, and Flatter itself didn't involve a bulge, right? But it just kind of in a litany cited to some cases that involved instances where bulges were one among contributing factors, right? Correct, Your Honor. One of those is the Alvarez case? Yes, Your Honor. Flatter relied on Alvarez, Allen, Hill, and Thomas for the proposition that this clerk is significant weight to a bulge that appears to be a firearm. Okay, so in Alvarez, it's a tip that comes that there's a potential bank robbery, right? Yes, Your Honor. And the tip said that somebody's going to go with a white Mustang GT to the bank with a bomb to rob the bank, right? Yes, Your Honor. And it gave the description that the person would get there. Anonymous tip gave the description that the person would get there in five minutes, right? Yes, Your Honor. And so police go to the parking lot behind the bank, and there's a white Mustang GT there, right? Correct. And it's backed into a parking space? Yes. And they ultimately get the guy out of the thing, and the guy's got a bulge? Yes. And they're actually arresting him before they find the bulge, right? I believe that's correct, Your Honor. I don't recall precisely when they were putting him under arrest. Okay. Isn't Alvarez about—isn't it awfully different than the case word here, Ron? I would agree, Your Honor. In terms of— I believe you're— Okay. I agree that in Alvarez, there's a significant number of additional facts, although I would point this court to the Hill case. This, I think, comes very close to concluding that a bulge alone that the officer believed to be a firearm would support it. And I'd also point this court to the Allen case. Well, let me go with Hill. Hill's another bank robbery case, right? It is, Your Honor. And there's a report that somebody has brandished a gun in robbing a bank, right? Correct. And there's some description, and Hill's actually stopped because he's within 400 or 500 feet of the bank, right? He is, although the officer goes up to him to ask if he's seen the suspect, and he affirmatively says he does not believe Hill to be the suspect. Okay. But he's got a bulge, but he's being questioned, at least in part, because of his proximity to the already-robbed bank where a gun was used. That is correct, Your Honor. And aren't those significant factors in giving proof of a reasonable suspicion to stop Hill? I think they're significantly undermined by the fact that the officer did not suspect Hill of being the robber, although I would like to point the court's attention to one more thing. In the Allen case, the defendant there is wet and has a bulge. There, the Ninth Circuit relies on Pennsylvania v. Mims from the Supreme Court. That's 434 U.S. 106, and the pin site is 111 to 112. In Mims, the Supreme Court found reasonable suspicion based simply on an officer observing a bulge as the defendant got out of the car, and then the officer's testimony that he believed that to be a firearm. The Supreme Court found that that alone was enough for reasonable suspicion. Well, Allen was drug-smuggling, right? Yes, Your Honor. And this guy, they're trying to bring marijuana into some kind of farm property, and it's kind of broken up, and they find Allen within close proximity, soaked. And it's, I believe, in the middle of the night, right? Yeah, well, the defendant who's relevant there, Colander, was found about seven hours later. The operation to interdict marijuana happened in the middle of the night, and he's found… Yeah, but Allen, yeah, and Allen actually didn't have a gun, did he? He just had a, he had some kind of wrench in his pocket. The relevant defendant is named Colander, Your Honor, but that's correct. He had some pliers in his pocket. So if the police officer saw a bulge in that case, he was wrong, right? It wasn't a gun. It was not a weapon in that case, Your Honor. Hey, I have just one question, and just kind of for my own curiosity, but I take it, you know, concealed weapons are not always as illegal in other states. I sit in Idaho, as they are in California. I take it from the Foster case. This was a 2018 case from our court. We basically said, you know, there's only 0.2% of the population that has a concealed carry permit. Let me ask you how a bulge, this is a bulge in California. What about a bulge in Idaho where there's more concealed carry permits? Does that change the analysis? If this case had happened in Idaho, would the officers have had a reasonable suspicion, or does it depend on the underlying state laws that are at issue? I think it could be a different case in Idaho, Your Honor. I think there's two separate issues. There's the reasonable suspicion of seeing a firearm, and then there's the Foster issue, which I think is Your Honor suggesting is dispositive in California, and there the court's analysis was contingent on the statistics that there were about 0.2% of the adult population that had received concealed carry permits. So, if in another state that's a radically different statistic, I do think Foster leaves open for this court a different outcome on a different set of facts. Okay. Thank you. I think that's enough. There's no further questions, Your Honor. Thank you. Thank you. Thank you. And we'll give two minutes on rebuttal. I probably won't need it all. I think the key thing is to be very careful in looking at what the district court actually found. Look at Excerpt of Record 1, page 12. The finding the judge made is that the visible bulge, that there was a visible bulge in the firearm. That we have no problem with. That the record supports. The second question that Judge Nelson started us with is, is that enough to draw a reasonable inference that the person carrying the concealed carry weapon, and we contend that it is not. The Ohio study, the stop and frisk, that basically the government had the burden to show that that wasn't a reasonable inference. And the court can't rely solely on officers' training and experience. They can consider it. But without some greater information and proof, this is opening way too broad a range. But let me posit another hypothetical to you. So these are sweatshirt cases. Is there a difference between a sweatshirt bulge and just a normal shirt bulge? What if they had been wearing a tight shirt, you can't see the gun, but it reflects an outline that is far more consistent with the gun. Would that be enough for reasonable suspicion? It would depend on the uniqueness. I mean, each of these cases is on the specific facts and specific circumstances. So if somebody has something that is much more like an outline of some kind of gun, and guns come in a variety of different forms and shapes, and God awful, I don't know what else they're going to invent tomorrow. The district court judge would have the power and authority to make a finding that that specific fact or description provides a reasonable inference. What is the danger here? And I would welcome you to take this out of the money context. Take it out of, well, I wear hoodies all the time when I'm not in court, but if I'm wearing a knit sweater and there's two pockets already pre-bulged, because there is a tight sweater, and I put my wallet in, a wallet may be taken out, but it will very much replicate what the patch pocket looked like as far as giving you the language. Look, counsel, let me just, I understand your argument, but my concern is once you concede that it's fact specific, then I think it becomes problematic because of what the district court did here and credited it, and that's, I mean, that's the problem. I mean, you either have a per se rule that bulges aren't enough, which is sort of how this case came up. Bulges aren't enough. You have to have something else. That makes sense. But you seem to be conceding, and I think you're right, that in some circumstances bulges can be enough. And once you go down that road, then we've got a problem. I'm not conceding a bulge. No, no. I'm not trying to put words in your mouth. I'm just saying that there are certain circumstances where a bulge, in and of itself, even absent any other corroborating facts or suggestive facts, could be enough. And so once you go down that, it becomes a very fact intensive. Well, I think if you look at the cases with the airports, which you cited the reason I'm blanking on the name of it, where, you know, they suspected someone of drug dealing and they required the woman to pull her clothes backward, and she refused to do so, and she actually went the other way, and the court rejected that as an intrusive search. And the point of this is a Terry style is supposed to be, if I can stop you, then I can just do a pat down and make sure all the facts are stated. This is a very different situation. It is always fact intensive, facts specific. I think the court will argue its own. Yeah. Thank you, counsel. Thank you. Okay. That case is submitted.
judges: R. Nelson, Bress, Gwin